At this time, we'll hear Dunaway v. MPCC. Good morning, Your Honors. May it please the Court, my name is Donald Saper. I'm here on behalf of the Plaintiff Appellant, Douglas Dunaway. This case revolves around a failure-to-hire age discrimination claim, and the Court is familiar with both the comments and questions that started the interview of Plaintiff's application for a job with MPCC as a Senior Project Manager. There was no doubt that when Mr. Dunaway walked in, he was clearly a senior citizen. He was the age of 65, and we have provided pictures to show what Mr. Dunaway looked like. Mr. Dunaway is here in the Court, if Your Honors would like him to stand up, I'd be happy to. No, I don't think that's going to be in the record. The District Court erred when it said that the comments and questions were oblique references to age that were consistent and suggested only that Urbanati sought to understand whether Plaintiff intended to retire in the short term. Would you concede that Mr. Urbanati was privileged to explore the subject of whether your client intended to retire in the short term? I do not concede that, Your Honor. That's odd, because you say that on page 30 of your brief. We believe that in a situation where somebody walks off the street, where there's no succession planning involved, in this day and age to ask a senior citizen when he or she plans to retire, when we all know that as a result of 2008 and the stock market crash, that people have changed their plans and will continue. People have changed their plans, then they could say, I don't plan to retire until I'm 80. Yes, Your Honor. And if someone says, well, I don't want anybody around until they're 80, now you have an issue. Well, assuming, Arguendo, that he was able to inquire into whether or not Mr. Dunaway Well, that's what your brief says. It says that Urbanati could have asked whether he intended to retire in the short term. But he did not, and in fact, Mr. Urbanati, in his deposition, never said that the reason he asked those questions or made those comments had anything to do with Mr. Dunaway's retirement plans. It was the district court which introduced... That's the next step of the analysis. Didn't Mr. Urbanati say at the beginning of this interview that I'm looking for someone who can work here for 10 or 15 years? Yes, Your Honor, that's correct. So, your client knew that was one of the requirements, and is it your position that, having said that, it was illegal for him to ask Mr. Dunaway? Well, what are your plans when you retire? It's our position that Mr. Urbanati testified that he considered a long-term employee, somebody who would be there for five years. He raised the bar for my client by a good five to ten years, bringing Mr. Dunaway into the area of continuing, stating that he would continue to work for the company until he was 75 to 80 years old, and we believe that that raising of the bar can be an inference of bias. When was this bar raised? Excuse me, Your Honor? I don't quite follow you. When was this bar raised? The bar was raised when Mr. Dunaway walked in, when Mr. Urbanati saw that Mr. Dunaway was a senior citizen. Mr. Urbanati said that when he thinks of a long-term employee, he thinks of somebody who will be with the company for five years. Nevertheless, he told my client something different. He told my client, who was 65 years of age, that he expected him to be there for ten to fifteen years. That's the bar that I say was raised. One of the issues, let me ask you to address, is this. I mean, this does not appear from the record we have before us to be a company that exclusively hires, you know, millennials. There were people around, all around this work site who were well into the class, indeed even older than Mr. Dunaway. That's a very good point, Your Honor, and it's always a difficult one for a plaintiff to overcome. In this case, as the EEOC indicated in its brief, each case must, each individual interview and applicant must be looked at on its own. We point out in our brief that all of the older employees that were hired prior to our client being hired were what we call legacy employees. They are employees who had been employees of Mr. Urbanati's father's company, Morris Park Contracting Corporation. I'm not sure why Mr. Urbanati is to be chastised for that. That's what we want, isn't it? He didn't come in and clear out the older employees. They all work. We are not seeking— To the extent we have a record of it, it does not, at least if you look beyond your client, this does not seem to be a company that has any just deep-seated hostility toward older employees. Do you think the people who were hired were both in the protected class and one of them was Mr. Dunaway's age or older? We think that a reasonable inference can be drawn that Mr. Urbanati Jr. was attempting to put back together the company that was left by Mr. Urbanati Sr. If the clients were familiar with the individuals that had worked for Mr. Urbanati Sr., that Mr. Urbanati was familiar with the individuals who had worked for Mr. Urbanati Sr., they had been loyal employees to Mr. Urbanati Sr. Doesn't that all cut sharply against your claim of age discrimination? No, Your Honor. Your Honor, we think it cuts in favor of an inference that MPCC wanted to be seen as a successor to Morris Park Contracting Corporation, not that it was embracing people because they were older employees or because they were younger employees. They were being embraced simply because they were former employees. We think that the key to this case that makes this different than every other case is when Mr. Urbanati said or asked Mr. Dunaway whether he was up to the vigors of a job. We believe that a reasonable juror could find that Urbanati was concerned about Dunaway's competency and productivity, which are stereotypical factors that directly relate to age in which this court has stated are forbidden by the ADEA. We also would like to point out that with respect to older employees who are hired three months later, that as the EEOC has pointed out, there was a game changer in between. In between the charge with the State Division of Human Rights and the hiring of competent employment counsel to counsel them, so we think that an inference can be drawn that either they stop discriminating as a result of having employment counsel or, as many employers do, hired people in the same age category as the person who was bringing a claim so that it would bolster their defense. This was a critical position in the company. It sounded like it was an important job. Yes, Your Honor. We believe it was. So a rational employer would hire someone who was less qualified in order to perform these important functions simply to insulate himself from administrative allegations? That doesn't make a lot of sense. No, Your Honor, but we're not saying that they were less qualified. What we're saying is that Mr. Dunaway was equally qualified, if not more qualified. That was never an issue in this case. Mr. Dunaway, after the interview, was found by Mr. Urbanati to be somebody who, based on his merits, was worthy of hiring. He put on the resume, which he considered to be pretty good and is a notation that he meant pretty good. He only started to retreat from that position when plaintiffs, when defendant's counsel on cross-examination during his deposition kept leading him, trying to get him to back off the pretty good, but he stayed with it. So what we have is contemporaneously with the interview, Mr. Urbanati saying that the are pretextual, because if he believed that Mr. Dunaway was dishonest, we think there would have been some notation of that. If he believed that Mr. Urbanati was somebody whose communication style and demeanor did not fit in with the company, he would have made a notation of that. Were there any regulations or anything that required him to write anything on this resume other than what he wanted? No, Your Honor, but at his deposition, he admitted that he really didn't remember anything about the interview. And it was only after the lunch break, towards the end of the day of the deposition of Mr. Urbanati, that he had this 11th hour epiphany where he believed that the reason that he rejected the application was because Mr. Dunaway, he said, had engaged in puffery about a job he had held years ago where he claimed that he was something of an operations manager and that that would command a salary of $250,000 to $350,000. But Mr. Dunaway wasn't applying for an operations manager job. He was applying for a senior project manager job, and $65,000 to $95,000 was, in Mr. Dunaway's belief, a reasonable salary range to request for a senior project manager position at a company that he believed was a good fit for him. So, Mr. Dunaway, I think you deserved a couple minutes rebuttal. I did, Your Honor. Thank you, sir. Thank you. Good morning. Good morning, Your Honors. May it please the Court, my name is Nicholas Reiter, and I represent the defendant appellees in this matter, MPCC Corp., and Mr. Joseph Urbanati, Jr. The district court's decision should be affirmed for four reasons. First, the district court properly held that Plaintiff did not meet his burden to establish a prime aphasia case under the first stage of the McDonnell-Douglas burden-shifting analysis. The few alleged age-related comments during the job interview, even if they were made, which the defendants deny that some of them were made, those comments are insufficient. They have to live with the fact that they were made. Under the summary judgment standard, yes, Your Honor, of course. But those comments are insufficient in light of the undisputed track record of MPCC Corp. and the sole decision-maker in this case, Joseph Urbanati, Jr. He has a track record of hiring age-protected individuals, individuals in their 50s and 60s, one of whom is even older than the Plaintiff, both before he ever met the Plaintiff and conducted the job interview in 2011, and after he conducted the job interview and rejected the Plaintiff's job application. Second, even assuming, for the sake of argument, that the Plaintiff had satisfied his prime aphasia burden under McDonnell-Douglas, he hired a gentleman, yes, Judge, he hired a gentleman named Lenny Zimpaglione, and there's a lot of facts in the record for why the District Court's decision should be affirmed, but I cannot overstate the significance of Mr. Zimpaglione. He was 68 at the time of hire, when Mr. Urbanati hired him for a superintendent, and that's critical in this case because the main reason Mr. Urbanati rejected the Plaintiff's job application is that he didn't think, based upon sitting down with the Plaintiff for about an hour during a job interview, that the Plaintiff had the personality, the communication skills, and the demeanor to work well alongside MPCC's superintendents, and that's the primary job duty of a senior project manager. They're making sure the trains run on time. They're making sure supplies are delivered on time to construction sites. They're in constant contact with MPCC's superintendents in the field who are overseeing the projects out in the field, and there's unrebutted testimony that MPCC's superintendents are gruff, tough, demanding, aggressive, screamers, who don't take nonsense from anybody, essentially, and Mr. Urbanati became concerned, based on his impression of the Plaintiff during the job interview, that MPCC's superintendents would essentially run over the Plaintiff, and that deadlines would suffer as a result, and that's important because the appellant is trying to argue that somehow Mr. Urbanati subscribes to these ageist stereotypes, and that he thinks an older candidate might not be able to have that demeanor and that personality to work well with the superintendents. What about the observation that he may not be able to put up with the rigors or vigors of the job? That certainly correlates with age. I submit it does not. There's nothing impermissible about an employer asking a candidate if he or she believes that they're up to the tasks and able to perform the job. In the disability context, for example, the Americans with Disabilities Act permits an employer to ask a candidate if they're able to perform the primary job duties. All we have here is a few age-related comments, some stray remarks, which this Court has held does not necessarily carry a Plaintiff's burden in a discrimination case, and then, again, it doesn't exist in a vacuum. The undisputed track record of Mr. Urbanati's hiring practices is what distinguishes this case from other cases where you have a few age-related comments and the Plaintiff is able to meet that minimal prima facie burden. I just want to pin down Mr. Urbanati's undisputed track record. He says that these are people who were hired, again, older people who were hired earlier, right? But during his father's time, and those are all the old people who were on the job, except for these two who were hired after the complaint. And then you cited Mr. Zimbaglione. Zimbaglione, Your Honor. Okay, Zimbaglione, who was actually hired by Urbanati, Jr.? Yes, Your Honor. Okay, so that's his undisputed track record is his father's hires and Mr. Zimbaglione. I'm sorry, I'm bad at Italian names. What can I say? Lenny Zimbaglione, Your Honor. Yes, it is undisputed, and here's why. It's not as if Morris Park Contracting, that predecessor entity, closed shop on October 31, 2005, and then November 1, 2005, all of these employees just came over to MPCC's new offices. It was approximately two years later that Mr. Urbanati, Jr. went out and hired Mr. Zimbaglione to be one of MPCC's superintendents, and that's for all the age-protected hires that happened after. There was a gentleman, Dennis Webster. He was hired as a senior project manager a year after the predecessor entity closed its doors, and he was 61 at the time of hire. And it's certainly undisputed about the hires after the job interview. You had Mr. FitzMorris and Mr. Guendo, ages 58 and 64, respectively. They were the ones who were ultimately given the position in this case. And so that's one of the big facts that distinguishes this case from other cases where the age-discrimination plaintiff was able to carry the crime of facial burden. In any event, the— these two hires is a little tough because he kept them for a year and two years, and you would think he'd ruin his business if he was only hiring people for that reason. But he said they were—he was educated by this experience, and therefore he started not to discriminate. And there's simply no evidence in the record other than the fact that there was a Division of Human Rights charge filed in the meantime, and, of course, counsel was hired. But that's exactly the type of speculation that's not sufficient to overcome summary judgment. And as Your Honor pointed out, these individuals were kept on for a year and then two and a half years. He was paying them six-figure salaries, you know, spending more than a quarter million dollars between the two of them each year just to pay them to work as senior project managers. It's completely speculative and far-fetched to think that he did it just to bolster his defenses in this claim. In any event, I don't want to dwell too much on the crime of facial burden because, as Your Honors are aware, this Court can affirm the District Court's record— excuse me, decision on any grounds that are in the record. And while I admit that the crime of facial burden is a relatively low burden, pretext is a much, much higher burden. And there's just simply not enough evidence for an appellant to carry that in this case. Mr. Urbanati proffered two legitimate reasons for why he did not think that the plaintiff would work out in this case. And Lenny Zampaglione issue is so big because he was one of the older— excuse me, he was one of the superintendents that Mr. Urbanati thought that Mr. Dunaway wouldn't be able to work with. So Mr. Urbanati can't subscribe to these ageist stereotypes when one of the gruff and tough demanding managers that Mr. Urbanati was concerned about Mr. Dunaway working with was older than the plaintiff in this case. There's simply nothing to support the plaintiff's argument that age had anything to do with it. It's certainly not the but-for reason that Mr. Urbanati ultimately rejected the plaintiff's job application. He can't show—there's no evidence to suggest that if the plaintiff was 35 years old when he walked in there, that he wouldn't have formed the same opinion about his demeanor, about his personality, or about his communication skills, and why he didn't think that'd be a good fit for working alongside MPCC's superintendents. And then it's nothing to say—it's certainly not extraordinary for an employer to question a candidate's veracity during a job interview, whether a candidate might have embellished about prior job history. Mr. Saper just pointed out during his oral argument that it was after the lunch break when Mr. Urbanati, during his deposition, proffered the second reason why he started to question the plaintiff's truthfulness during the job interview. But he was asked on the record whether he spoke with counsel about his testimony or anything. He said no. There's no evidence to suggest that he was manufacturing that reason. And it's not so strange that during a nearly seven-hour interview— excuse me, deposition, under thorough examination by appellant's counsel, that Mr. Urbanati would proffer that second reason. And it made complete sense because it's undisputed that Mr. Dunaway, during the interview, claimed he was the nuts and bolts and the heartbeat of a prior employer, a competitor of MPCC's with whom Mr. Urbanati is familiar, a construction company called J.A. Jennings, Inc. And under questioning from Mr. Urbanati, Mr. Dunaway had to admit that he had been laid off from that position. And that raised a question in Mr. Urbanati's mind. Why would he be laid off if he was essentially running the operation like the plaintiff claimed? And then when Mr. Urbanati asked him, well, what kind of salary are you looking for if you get hired, he said he'd accept a salary as low as $65,000. And that raised a red flag in Mr. Urbanati's mind. So it was $65,000 to $95,000. Yes, Your Honor, correct. That's why I said as low as $65,000. If you give a range during a job interview, I think it's fair for the employer to accept— Someone leaves those answers anyways.  It's not—Mr. Saper was trying to point out that, well, it's reasonable for the plaintiff to put in a low salary. That's irrelevant. All that's relevant is what was going on in Mr. Urbanati's mind when he heard that response, and it had nothing to do with age. What's going on in his mind is something that can be decided on summary judgment. There's just simply not enough evidence to show but-for causation in this case, Your Honor. Thank you. Thank you. You're welcome. Your Honor, in response to your question about Mr. Zampaglione and Mr. Webster, they were both legacy employees. They were hired. They were people who had worked for Morris Park Contracting Corporation, and as MPCC built up its business, they were hired. So they were not people who were hired off the street. The only ones hired off the street— The difference doesn't make whether people are hired off the street or whether they know them. Because— If you know them, you're more likely to hire them. That's correct, Your Honor, and as we've said— But if you're obsessed with people's age, and that's the criterion or a major criterion, then it doesn't matter whether they're 65 years old on the street or 65 years old as a legacy. We believe that Mr. Urbanati showed that he was obsessed with showing that his new company, MPCC, was a successor to Morris Park Contracting Corporation, so it was important for him to bring back the people that his father— that had worked for his father for years, regardless of their age. Other than the one comment about vigor, the question about vigor or rigor, what other direct evidence of age discrimination did you have? Well, as I said, I believe that by virtue of the fact that Mr. Urbanati asked the question to Plaintiff what his age was and asked these other questions regarding age, which he did not ask— The two questions had to do with vigor and how old you are. How old you are. And how long he'd worked there and whether he'd continue in the industry. Now, those questions were not asked to the two people who subsequently were hired, even though Mr. Urbanati said that those were questions that he always asked. How long he worked where? Excuse me, Your Honor? How long he worked where? How long he would work with the new company. Excuse me, Your Honor, I'm sorry if I misspoke. But everybody who was hired off the street was in their early 40s. There was nobody in their 50s or 60s who were hired for the senior project manager or project manager positions that were in Mr. Dunaway's age category. The employer— They were in their 40s and 50s in the protected class, but not as old. They were not in their 50s, early 40s, Your Honor. And the two people who were hired subsequently to your client's application were what, 41 and 61? The two people who were ultimately hired three months later were late 58, I believe, and 63, 64. I'm not sure. But older people, for sure, and this was three months later, so there had been many, many interviews. So clearly he may have been looking. We think a reasonable inference can be drawn that he was looking for somebody who would be close to Plaintiff's age. And we think a jury should be able to decide whether that was the reason that the two people were hired at that age. Well, to follow the argument of your adversary, is it reasonable to think that someone would hire two project managers to run the projects on which they hope to perform and keep their clients just because they were older so that they could have a better case before the Human Rights Commission? Yes, Your Honor. We're not saying that Mr. Urbanati lowered the bar in order to hire other people. All we're saying is that he waited until he had the right people that would help him with his defense. We're not saying that they were not qualified. That is not anything at all that we're— It would be very strange to staff a company in the senior echelons just in order to frustrate somebody who is making a complaint. I respectfully disagree with you, Your Honor. If you have to hire somebody, there were many people, I presume, who were qualified to do the job. Why not hire somebody? That might have been better than pretty good, wouldn't you think? It may have been better than pretty good, but there's no evidence of that. And most importantly, when we talk about the reasons that were given by Mr. Urbanati, they were subjective reasons. And there was no clear and specific evidence, facts, that he could state as to why he felt that Mr. Dunaway, in his communication style or demeanor, would not fit in with the company. And with respect to his working at Jennings, it was clear that Mr. Dunaway, who, by the way, has a different story— Isn't that the purpose of an interview, to talk to somebody? I mean, he does have a resume. Yes, he did, Your Honor. A very impressive resume. It doesn't have any dates on it, which is interesting, but he has an impressive resume. You talk to somebody to see whether they'll fit in in the environment of a company. But if you're going to say that somebody didn't fit in, you need to give clear and specific reasons. He was unable to give a single one. But in the real world, as Judge Jacobs was suggesting, one of the main purposes of an interview is to form a subjective understanding of who this candidate is. It happens every day that someone doesn't get hired because an employer gets the wrong feel from an interview. Your Honor, I agree with you 100%, but this Court has pointed out, as we show in our brief, that if you're going to use subjective reasons, you'd better be prepared to give clear and specific facts as to why you formed that subjective reason so that the plaintiff has an opportunity to rebut. I didn't like the way the person said during the interview. They just did not strike me as someone I particularly liked and wanted to spend a great deal of time with. That's inherently subjective, and in the vast majority of the cases, you can't point to objective reasons for reaching those conclusions, but you reach those conclusions during the interview. But those weren't Mr. Urbanati's reasons. Mr. Urbanati's reasons had to do with communication and demeanor, and he was unable to give a single fact as to how Mr. Dunaway acted or communicated that indicated to him that he would not fit in, nor was he able to indicate any way that Mr. Dunaway acted or communicated differently than the two men who were hired, Guendo and Fitzmaurice. We think a jury should be entitled to weigh the evidence and decide whether Mr. Urbanati is being credible or whether Mr. Urbanati had an age bias. That's all we're asking. We think that reasonable jurors could find, based upon this evidence, that but for the fact that Mr. Dunaway was 65 years of age, he would have gotten the job because he was pretty good and he had a resume, as your Honor indicated, that showed that he was somebody that could do the job. Thank you. Thank you, Your Honor. What was your decision?